The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated please. All right, this morning we're going to begin with the case of Fernandez v. RentGrow, and Monaghan, we'll hear from you. Good morning. May it please the Court, my name is Maura Monaghan and I'm here on behalf of Defendant Appellant RentGrow, Inc. The class certification order below should be reversed because the named plaintiff lacks Article 3 standing and because the necessity for the same individual inquiry that demonstrates that the named plaintiff did not suffer any concrete reputational injury overwhelms any common issues affecting the class. This appeal arises from a set of undisputed facts. Mr. Fernandez applied to rent an apartment. His property manager received a tenant screening report that noted he was a possible match for a similar but not identical name that appeared on the OFAC list maintained by the U.S. Treasury Department. The property manager testified that she did not know what OFAC was, that her practice was not to read that section of the report, and that consistent with that practice, she had no recollection of reading the OFAC section of Mr. Fernandez's report. Is that relevant whether that person read it? The reason I ask this question is, RentGrow was in the, it basically was providing that information to landlords who subscribed, right? They paid a service fee for that service? No, Your Honor. That is a distinction between this case and the case of Mr. Ramirez. You mean the landlord doesn't have to pay RentGrow anything? No, the landlord does pay RentGrow for the report. Okay, that's my point. So RentGrow sends this to its subscribers, people who subscribe for the service. In this case, the landlord asked for the report. It was provided. That means it was disseminated. And it was acted on. And it was acted on to the representative parties' disfavor. Now, you're suggesting that somehow that there's no publication in that type of situation? Correct, Your Honor, because in this case, there are two different aspects of the report. There is the OFAC section, which is what is challenged in the class case that Mr. Fernandez brought. And there is the criminal history section, which is not at issue in this appeal. It was the criminal history result which caused the report to return a reject result, not the OFAC result. And I think the transunion case is clear that information has to not just be processed, but read and appreciated. And that is consistent with the tort of defamation, which is the common law analog for purposes of analyzing injury. I think transunion said that. I think transunion talked about the notion when it's an internal versus external communication. But the holding of transunion is basically dissemination as opposed to holding it in-house. And I mean, if this fact was announced on the radio and you don't know who listened to the radio, maybe nobody had the radio on. Does that mean it wouldn't be a publication? In that case, it would be a publication, Your Honor, because I think circumstantial evidence demonstrates that it's heard in that case. That's what I was suggesting initially here, that you have a landlord who's a subscriber for a service. He has an ongoing relationship with RentGro. He said, provide me a background on this man. The RentGro provides it for a fee, and then they act on it. Now, within that, whether every detail was understood by the particular person who looked at it, it seems to me it's still disseminated. It's given to the landlord who has that information and acted on it to deny him. Now, you say it's because of his criminal record. Well, that might have been the one that's easier to advance. But it seems to me to put somebody on a terrorism list is probably as bad as you can get. It's the red A of adultery. So, Your Honor, I think RentGro does not challenge the fact that if someone read and appreciated the appearance on the OFAC list, that could be defamatory. But even a statement that is defamatory in implication has to be read and understood. So, Counsel, on that point, I understand the reference to the footnote in TransUnion that you're relying on. Help me with this. The footnote indicates that the court and the majority were aware of this issue of reading and understanding. They talk about it in the footnote. Even so, the holding says dissemination. So, on the one hand, you can look at the footnote and say, hey, when you're dealing with a question when it's not read or understood, maybe TransUnion doesn't control. But another way of looking at that is they were aware of that issue and nevertheless had a holding that drew the line at dissemination. Why is your reading right and the other way wrong? Because I think each case turns on its own circumstances. I think the case law is very clear that the question of Article III injury is one that each case has to examine. What the footnote actually states is that defamatory injury requires that the defendant actually brought an idea to the perception of another and that the defamatory information was, quote, actually read, close quote, and not, quote, merely processed, close quote. In the TransUnion case, which is quite distinct from our case, the auto dealership had paid extra for the OFAC information in particular, had separately subscribed to that. It was different than the OFAC information being just attached to the report. It is also the case that in that case the named plaintiff had been declined the ability to enter into a transaction precisely because the auto dealership had seen and appreciated the import of someone appearing on the OFAC list. This case is exactly the opposite as to all of those points. The holding of TransUnion, they're very clear about how they made their holding. And they made their holding based on a credit company who disseminates as distinct from a credit company who includes it in the record and doesn't disseminate. So the important distinction that the court made was dissemination. And again and again in the opinion, I don't know how many times, maybe four times, it says by contrast, by contrast now we're talking about the 1,853 class members, including Ramirez, whose credit reports were disseminated to third-party businesses during the class period suffered a concrete harm. So the dissemination is inherent in the dissemination as a form of publication. They distinguish between keeping it in-house and disseminating it. And the nicety of whether it was fully appreciated or understood, this went to a subscriber. It went to a business who paid for it. And I think it's a pretty fine line to draw. I understand your argument. And your argument relies on this footnote, which even has a derivative aspect. It goes through two steps to the common law type of thing. But I don't know how we distinguish that from a newspaper publication or radio publication. We have a lot of types of publication where we infer that it is damaging to the person. And here we have a subscriber asking for information about a person. And it's actually provided to that person. Now, what they did with it at that point is a distinction maybe. But I don't think that the holding rises above that of transunion. Because they kept making the distinction of what they meant by dissemination. And the fact that when you're a credit company and you hold it and you made a mistake and you're holding it and you haven't sent it out and then you get it corrected, they said there's no concrete damage. But once you disseminate it to a third-party business, that statement is made again and again. I read transunion and found it difficult to distinguish it. So what I would say, Your Honor, is that transunion was dealing with a case before it, which came up after a jury verdict. There was no challenge in transunion. No one suggested that the reports that were disseminated were not actually read. Here we have affirmative evidence that these reports were not read. Transunion is also clear that the analogy they're drawing is to the law of defamation. It would be a wholesale change in the law of defamation to say that information that is not read would sustain a sufficient injury. In Walden v. Fiore, the Supreme Court said that a loss of reputation occurs only if the defamatory information is communicated to and read and understood by third persons. And that simply didn't happen here. I hear you. I get the distinctions you were pointing out in the questions a little bit ago to me, and I appreciate the defamation requirements of read and understood. But I'm still struggling with the Supreme Court. We kind of got to follow them. We might not like to all the time. We might disagree. But when they have a holding that says dissemination in an opinion where, at least in a kind of forfeited argument, they are raising this possibility or this issue of reading and understanding, and yet they have a holding that, if it applies, would mean they're standing here. So we got to say that holding that, if it applies, would say they're standing somehow doesn't apply. I think you have to read that note in connection with the opinion as a whole. The opinion as a whole is rife with that the inquiry is whether there is a concrete injury. That's the fundamental tenet of Article III's standing. And there's no implication in the opinion that there's an intent to relax that or to relax the injury requirement for Article III. The Supreme Court was not saying that dissemination alone always confers standing. It was saying that in this case, it did not have difficulty concluding or letting stand the jury conclusion that the transmission actually caused injury. But there were facts there that we don't have. I mean, it looks like maybe an argument is there they were grappling with the difference in misleading information that was not disseminated and misleading information that was. And that's what they're really contrasting in the opinion. And that might be a way of interpreting the holding. But the holding is potentially problematic to your argument. I guess the point is, when you look at the reasoning, what they're really doing is distinguishing between two things that aren't applicable here. I would also note, Your Honor, that we're here on a Rule 23-F petition. So we're talking about not whether just an individual has standing, but whether an entire class has standing. And under Walmart v. Dukes, the defendant has a due process right to challenge standing. And the district court here recognized that there might be a basis to challenge whether injury occurred in each class plaintiff's case. That makes the case not appropriate for class treatment, even if you concluded that dissemination alone could constitute standing. And there are also distinctions throughout the class. So, for example, the property manager here testified. I see my time is up. May I continue? Why don't you do it quickly? Okay, I will. You've got some rebuttal time, right? Yeah, you have rebuttal time. I do. I'll just finish by saying the situation here is very different, because the OFAC result does not translate into whether the report returns accept, reject, or reject with conditions. The property manager testified that if it comes back at accept, no one at her company ever reads any further. That would mean there's a whole host of people where it isn't even pulled out of the database because they never look at that section of the report. These are digital reports. And so that is just like sitting in a file. I'll reserve the rest of my time for rebuttal. Thank you, Your Honors. All right, Mr. Wessler. Yes, Your Honor. May it please the Court, Matthew Wessler for the appellee, Marco Fernandez. I think I just want to pick right up with the holding of TransUnion, because I think that really does resolve the outcome of this appeal. And, you know, Judge Nenar, you identified multiple points in the opinion where the Court is drawing the exact distinction that the district judge drew here. It does draw that distinction, but as you know, the underlying facts of Ramirez himself, he was told that he was on a terrorist list, and so there's no question about that. The holding is more general, and you're supported by the notion that they categorized 1,800 people as a member of that class just requiring dissemination. There's no notion that those people had to have their reports read. But, that all being said, is it a requirement of defamation to have it be read? And that's the main point I think that Rent Grows Making is that the holding of TransUnion is fairly general and might include this, but she argues that in this case, there is evidence that it was not read. Right, so there are a couple of responses to that. I think your principal question, does defamation law require that something be actually read? The answer is no. There were a wide range of circumstances in which a plaintiff could proceed on a defamation claim without needing to prove that an individual actually read the information. Well, let's divide that up, and there's two issues there, right? One is does the law of defamation recognize a reputational injury? That's yes, right? And the only way to show a reputational injury is that someone actually heard and understood the defamatory statement. Now, a separate question is how do you prove that, right? And there are cases where parties are allowed to prove that by a presumption, right? That if something goes out over the airwaves, we presume someone heard it, and if it's of a certain character, we presume that they understood it and you were defamed. But those are, I think, two questions. There's the legal question of what's required for a reputational injury, and then how do you prove it? Sure. Now, a couple of responses to that. If you give me 15 seconds, I just want to back up and just make this one point before I answer your question, Judge Rushing, if that's okay, which is that we can talk about the defamation law, but just to remind the court, when we're asking questions about Article III standing and a statutory cause of action, we're not going to require a jot for jot, element by element, exact replica of a defamation claim. So I just want to just note that. But to answer your specific question, there were claims at the common law where a plaintiff wasn't required to actually prove reputational harm, for instance, defamation per se. An example would be … Yeah, right, right. But that goes to proving the elements of defamation. You're right that the question here is not, you know, have you proven the elements of defamation, but the Supreme Court's told us to look at the kind of harm, and they've said for this kind of claim you're bringing, it's a reputational harm, and someone's reputation can't be injured unless someone else, a third party's heard something bad about them, like potentially misleading. So if these reports only were delivered in hard copy, if they're not digital, they're printed out, they're put in an envelope, sealed, you know, with a stamp so you can tell if they've been opened, and say the property manager says, testifies, I never, ever read these, and produces a box full of the sealed envelopes, no one's ever opened them, including one for Mr. Fernandez, would there be any argument that his reputation has been harmed, that it's been disseminated, but the envelope's never been opened? Yes, and I return back to a defamation per se concept. If you look at the restatement as an example, in that context, what the restatement says is in cases where the character of the defamatory statement is so severe, a plaintiff can sue without waiting for there to be actual reputational harm. Yeah, yeah, that's different. He doesn't have to prove, he doesn't have to monetize and prove someone heard it and it affected me in this particular way. We presume he's been damaged because it's about a certain topic. But if no one heard it, no one ever opened that envelope, no third party ever heard someone say he's affiliated with this drug trafficking ring or he's a terrorist. That remains in the envelope, no one ever heard it. But it was disseminated because it was sent to their post office box. Do you think there could be a reputational injury? I think yes, under a defamation per se theory, but I think you don't have to answer that question in this case for several reasons. First, the Supreme Court in TransUnion said the dividing line for Article III standing purposes is dissemination. No, they said in that case it was dissemination, but they pointed us to a reputational harm and we have to figure out what that means. I'll let you argue, but defamation per se, that's about damage. That's about an element of a defamation case is damage, and that's different than did someone hear the misrepresentation? Did someone understand it? Have you been injured even if you can't quantify it? I do just want to be clear about the holding of what TransUnion, at least as I understand it, and I think it comes directly from the opinion. There's a couple of places in the opinion where you could look, but I'd point the court to the second to the last paragraph of Justice Kavanaugh's opinion, which is set off by asterisks where he summarizes the holding of the decision. And this is what he says, no concrete harm, no standing. The 1,853 class members whose credit reports were provided to third-party businesses suffered a concrete harm and thus have standing as to the reasonable procedures claim. I think that's about as clear as you can get for what the dividing line is for Article III standing purposes in this context. Counsel, I think that's your best argument. That is clear, and if that's a holding that applies in whatever the facts are, maybe we're bound. But when you read the opinion, it seems to me the main issue that the Supreme Court's dealing with with TransUnion is this difference between misleading information that they're discussing the mere existence of it and they're discussing misleading information that's disseminated. That's what TransUnion is about. And all the stuff when they're talking about dissemination in there, it's contrasting mere existence. Now, I get your argument. Despite that, they did use the word dissemination, and maybe we just stick with that. But you're asking a lot, it seems to me, for us to read that opinion to apply when the question here is a whole different question, not just mere existence versus dissemination, but dissemination when there's evidence that was never read or understood. Well, I think, Judge Quattlebaum, you identified the issue with that theory in my friend's opening argument, which is it was definitely on the Court's mind whether there was an actually read requirement that a plaintiff in this context would be required to establish before a court could find Article III standing. Justice Kavanaugh's opinion identifies that question and that issue. And what he says is that might be required in the context of an internal publication theory where the file is- Well, not just internal. There was also distribution to a printer or something like that. There was internal and there was external. Sure. And the common law does make distinctions in certain contexts where the information is going, for instance, to a stenographer or some other entity that's related to the business of production of the information. But the distinction that he's drawing when talking about this actually read requirement is in the context, and he says it in that footnote, the internal publication theory that the plaintiffs were arguing allowed the 6,000 members of the class whose reports were not publicly disseminated to satisfy Article III standing requirements. I just do not think there is any way to import, which is what RentGrow is asking this Court to do, to import that requirement as an aspect or a feature of the Article III standing analysis for individuals whose reports were disseminated. And I appreciate the argument, like you said, I raised that it was on their mind and they didn't incorporate that to the holding. I get that point. Maybe that's compelling. But let me ask it this way. The Supreme Court also emphasized over and over, which they've said several times, that the mere violation of a statute doesn't create standing. And if we view the evidence as not establishing a general dispute of material fact over whether the OFAC information was read, what harm does Mr. Fernandez have other than violation of the statute? Assuming what I said, that you haven't created a genuine issue of material fact that it was read and understood by the recipients. I understand the hypothetical. I think that what would happen in a case like this at common law is that courts would presume reputational injury given the character and nature of the statement, which was that Mr. Fernandez was on this terrorism watch list. So your position is you can't articulate any actual harm, but we're supposed to presume it even though it wasn't read? Yes, and I think that's exactly how the common law would work in a case like this. But can I push back against the premise of your hypothetical? Yeah, I knew you would. Because it is not the case that the record here was somehow devoid of any evidence that anybody actually read the report. Quite the contrary. What you have at this stage on the record is evidence that two people at the landlord's office read the report. And just to be clear about the way this report works, it's not as though the criminal history section of the report, which there are testimony in the record admitting that that aspect of the report was read. But that information is not 100 pages away from where the OFAC terror watch list information is. It's right on page one. Both pieces of information, if you look in the record, on page one of this report in the same quadrant of the page, identify Mr. Fernandez both as having a criminal record and right below that or above it. I'm sorry, I can't quite remember. But it's right in line with that information. It also says he's on the OFAC. There's a possible match to the OFAC terror watch list. Can I ask you about that? Because I did. I found that a little, I don't know, interesting or difficult, complicating. That first page has the accept or reject, and it gives the reason, the criminal history. And then you're right, it says OFAC possible name match. And then some pages later, the penultimate page of the report at the bottom actually gives the OFAC information. And that's where it says Mexican drug cartel connection or something. Anybody who reads that would know they're accusing this man of committing a crime. That seems to fit, you know, it's a reputational harm. The OFAC name possible match seems to be what the property manager testified. I have no idea what OFAC means. It almost struck me as something, defamation law, they use hypotheticals about a foreign language. You know, if someone says something nasty about somebody in a foreign language and no one in the room understood it, it's not defamation because no one knows what it means. Is there a distinction we have to draw between do we have to know if they read the next to last page? So no, and no for at least two reasons. I'll try to get both of them out. The first, Judge Rushing, is at common law, circumstantial evidence was a perfectly legitimate way to prove that somebody actually read. In other words, the common law did not require direct testimony from the person who may have read or heard the information that they read it, understood it, and it was defamatory. And so that's one answer to your question. But I think the more important answer to this question is the OFAC information is not like a foreign language. It is, as Judge Niemeyer, you said in the opening part of the argument, the red A for this kind of report. It is radioactive. And it means if the landlord were, in fact, to rent to a consumer, someone who is trying to get an apartment, if they actually rent it to somebody on the OFAC list, that is a crime and the landlord would go to jail. So this is not a situation where, you know, it's hard to parse what this means, we're not sure, it's an acronym. More than the criminal background history, the OFAC list is as severe and serious a negative piece of information as you can find. And I think you're right that we could maybe presume that, but then can, I mean, does the defendant have a right to rebut that presumption by putting in testimony from someone who says, actually, we don't read that, I have no idea what it means, it just doesn't matter to us. Sure, I think that's possible. We're at the summary judgment stage in this case, and so the inferences about what this information means are drawn in favor of the plaintiffs, not the defendant who is moving for summary judgment. Right, but it might be relevant in deciding whether there should be a class on this. You know, the district court kind of, you know, in a footnote didn't, said I've already dealt with this standing question, so I'm not going to consider this when it comes to deciding about certification. Well, so two things. One, the same question is identical across the class. Just to remind the court, this is not a situation like in TransUnion where there are two distinct groups of people, one of which had the reports sent to third parties and one of which didn't. Everybody in this class had a report that was sent to a third party, to a landlord. And so the same question, whether, and the reports are identical on the OFAC list issue. They appear in the same place. They all included this OFAC information. So just in terms of how you would think about that question on a class-wide basis, it's the same. Other than arguing that there were, there was an individual who didn't read the report, which I think blinks reality on this record, Rencro hasn't identified any other evidence that would suggest that no one read these reports. And I think if you don't do that, you have the burden of proving it. I mean, you got to prove, I mean, you have one argument that you win just by dissemination. But if we're now talking about have you created a genuine issue of material fact or shown enough to satisfy your standing burden, if you assume it has to be read and understood, that's your burden, not theirs. And the only witness who testified, you know, arguably doesn't, you know, create that, you know, allow you to satisfy that burden. Just to be clear on the specific facts, that witness testified that she would have read this report. She claimed she didn't recall. But she said it was her practice to read these reports for someone like Mr. Fernandez. And the other testimony in the record from the plaintiff is that he was told by a separate employee that he was ineligible to rent the apartment because of something on his report. I think the fair inference of both of those facts is that the report was actually read. And if you couple that at the summary judgment stage with, Judge Niemeyer, what you pointed out, which is these reports are not just put somewhere and available to be taken whether or not the landlord wants to. These are reports that are directly requested by the landlord when an applicant is applying for a job, which indicates, I think, again, a fair inference at this stage of the proceeding, is that they are requesting them to read the report to make a determination about whether to rent the apartment to the individual. Let me ask you this. And you seem to have argued this earlier on. And I'm curious about whether you're maintaining this point. We're talking about standing to bring a claim. And, of course, we have to show concrete injury, which means actual injury or imminent injury. It doesn't mean you have to prove the actual. If I thought you made a distinction about the difference between somebody having standing to bring a suit and the actual proof of the suit at trial. And it seems to me that to the extent that somebody understood or recognized, we clearly have people who read the report. And the question is, did they understand this particular aspect? It seems to me it goes to the trial defense, but it doesn't go to the fact that the plaintiff at least has the standing to raise that constitutional right to challenge that in a court of law. And you seem to make a distinction on the level. And it seems to me that that's what trans unions seem to do, too. It made a grosser distinction and said dissemination gives it to you because there is either actual injury or imminent injury. Yes. And you used the word imminent, I think. I think that's absolutely right. And the dividing line, Judge Niemeyer, for the constitutional question, do you have Article III standing? The dividing line that the Supreme Court identified was dissemination. And there really can't be any doubt about what that word means. That doesn't hold liability. That just creates standing. You're making that distinction, do I understand? Absolutely, Judge Niemeyer. All we're talking about at this stage is Article III standing. We are not talking about liability on the merits down the road. And I just would submit that there is no way to read what the court said in trans union, where the dividing line was for Article III purposes as anything other than dissemination. Not only is that word used a half a dozen times in the court's opinion, not only does the court turn its analysis on the second class turns on the absence of dissemination, you see that phrase used in its analysis of the class whose reports were not sent to third parties. But were there any doubt about what dissemination means? The court used other language similar to that to identify the dividing line. Was the information sent to third parties? Was it provided to third parties? That's all that's required for Article III standing purposes, unless the court has further questions. All right. Thank you. Ms. Monaghan. Thank you, Your Honors. Referring to- Can I just pick up on that question? I'm curious. There seems to be the possibility in trans union because they are aware of the facts there, but didn't rely on the detailed facts. And they really relied on the distinction between holding the report in-house or disseminating it to a third party, which would give you standing to challenge, to present your case. But I didn't read them to think that that establishes liability. That just creates standing to challenge it and that you would still have the defense in a reputational harm to argue that it was not read or would not be read. I think you also have to face the question of whether it would be read because if he was denied because of his criminal record and then he said, that's not me, and they go back and read the report, the check, it seems to me that the chances of them reading it more carefully would be pretty likely. And it is such a damaging piece of information. My question to you is the distinction between liability on the claim and the showing that's necessary for standing to make the claim. So I think there's two answers to that question, Your Honor. One is that standing is obviously a threshold issue. If the court doesn't have standing, it doesn't have jurisdiction to hold a trial. So you're not supposed to defer the standing question to the trial phase. But also this entire discussion that we're having about can you think this, can you think that, what about this section, what about that just points to the predominance of individual inquiries and brings us back to the Walmart versus Dukes issue. That goes to a class action issue, a different one. I'm trying to find out whether the standing issue is distinct in kind from examining the elements of the offense. And it seems to me there is something to be said for the notion that standing gives you a right to be in court, to give the court the power to hear the case. You have to be close enough to the claim to be able to assert it. Whereas the defenses of whether it was actually read or whether it was understood would hardly go to standing. Now, on the class action issue, that's another point you have, I suppose, on individualized claims or not. Well, I think it's an important point, particularly given that this is a 23F petition. But I would also say, Your Honor, that if you read TransUnion, you will see it is replete with references to concrete injury. I know, but they define that as both actual injury and imminent injury. But in this particular case, they construed that to mean dissemination to a third party for purposes of standing. That's how they characterize it. And they did that again and again, and they did that not only in a gross term, but they made a distinction as to what they meant by that. They made a very clear distinction that the reports that were never disseminated did not confer standing, but they did require a showing of concrete injury. And I'll quote to you from the TransUnion opinion. It says, Since the basis of the action for words was the loss of credit or fame, that is the concrete injury. Your standing in the community is reduced. That requires some showing beyond mere transmittal. It's like you have two radios. You have to have a transmitter and a receiver. And what is absent in this case is evidence that there was a receiver. The court referred to that old adage about if a tree falls in a forest and no one hears it, has anything really happened? And the answer is nothing has happened that confers concrete injury for standing purposes under Article 3. They did define concrete injury to include imminent injury. And here you have a hot reputational statement in a report that was read by two people at least, and that still stays there in their hands and could be consulted as necessary. I'm just suggesting to you that the constitutional standard for getting into court seems to me is not coterminous with the proof of the actual claim. That's true, Your Honor, but for concrete injury, there's like a clear overlap. Can I ask you about that? Yes, of course. Does proof of this actual claim here under the statute require any reputational damage? I thought it was statutory damages just for having a mismatch. It is correct that it is a question of statutory damages. Can you dispute liability on the merits by pointing out that this wasn't read? By pointing out he didn't suffer a reputational harm, or does that get you nowhere when it comes to the merits of your case? I think that gets you right back into Spokio land, Your Honor, because what you're saying then is that there was a procedural violation that didn't actually cause any real-world harm. The statute allows for that, but Article III does not. Right. It might be a standing problem, but Congress is okay with liability on that grounds if you get that far. Correct. I would say that's correct. But I think that's where these cases all arise. I'm sorry, Judge. Well, you can prove actual damages or statutory damages. Correct. And on his criminal history claim, Mr. Fernandez is attempting to prove actual damages. And just to note, what ultimately happened here is he resolved to the criminal history issue, rented the apartment two days later, no one ever referred to the OFAC issue. So to Judge Niemeyer's imminent harm question, it's clear that that did not, reviewing the reject information did not cause them to focus on the OFAC information. That's the undisputed record here. I suppose it could. The landlord knows it now, don't they? Sorry? The landlord knows it now. The landlord only knows it because Mr. Fernandez brought the lawsuit. Right. Well. I don't think a plaintiff can create concrete injury by bringing a suit after the fact. I think probably even my opponent would agree with that. But to sum up, Your Honor, I think dissemination alone is not the focus of transunion. Transunion is focused on is there concrete injury. In that case, based on the record before it. That begs the question because we start with your statement that there has to be concrete injury. That's a standing statement for all times. I mean, that goes into all circumstances. They then defined it and then they applied it. And they applied it in the context of a statute which has technical violations and violations that could cause actual injury, could cause imminent harm. And they drew the line saying if it's held in a house, it's a violation, but it's no injury. And if you disseminate it, maybe that's an interpretation of the statute. I think, Your Honor, there might be an issue of injunctive relief in that instance. But I think it's pretty clear that concrete injury is required for standing, not just potential concrete injury. That's replete in cases like. You're mixing up terms. Concrete injury is defined to include potential injury. I mean, if you look at the Seventh Circuit's distinction between Camillas and Ewing, you will see that in Ewing where a credit score was lowered, there was standing. And in the case where it had no impact, there was no standing. Because in that case, you could deduce from the credit score being reduced that the recipient of the report had acted on it. So there was concrete injury. The mere possibility of concrete injury, which was also addressed by the Second Circuit in Maddox, is not enough. All right. Thank you, Your Honors. Thank you very much. We'll come down and greet counsel. It's our custom in the Fourth Circuit. There was a time when the Third Circuit considered doing that. And they came down and observed how we did it. And they enjoyed it very much. And then I learned later, they went up and tried it. And a couple of judges said, I didn't want to go down and shake their hands after we had that argument. And I thought, that's exactly when you need to do that. So we'll come down and greet counsel and proceed to the next case.
judges: Paul V. Niemeyer, A. Marvin Quattlebaum Jr., Allison J. Rushing